The People of the State of Illinois, Plaintiff-Appellee, *v.* Alonzo Flynn, a/k/a Carl R. Colston (Impleaded), *et al.,* Defendants-Appellants.

(Nos. 58204, 58866 cons.; ▮▮▮▮▮▮▮▮▮▮)

First District (5th Division)—October 11, 1974.

James J. Doherty, Public Defender, of Chicago (Marilyn D. Israel, Assistant Public Defender, of counsel), for appellants.

Bernard Carey, State's Attorney, of Chicago (Patrick T. Driscoll, Jr., and William J. Haddad, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

After a bench trial, defendants Alonzo Flynn and Irving Duffy were found guilty of armed robbery and aggravated assault and, after holding that the charges arose out of the same transaction, the court sentenced them to terms of 10 to 15 years for armed robbery. On appeal they con-

tend that they were not proven guilty beyond a reasonable doubt and that their sentences are excessive.

The following evidence pertinent to this appeal was adduced.

*Dolly King testified for the State.*

She is the wife of Leonard King and lived with him and their 5-year-old daughter at 1945 W. Crystal. On the evening of November 6, 1971, at approximately 9 P.M. her husband went to the store for groceries returning approximately 15 minutes later accompanied by the two defendants. Defendant Duffy put a gun to her head and ordered her to the dining room area where Flynn was holding a gun to her husband's head. Duffy announced it was a robbery and demanded money. Duffy took her back to the kitchen where he put the gun to the baby's head at the same time warning the witness that she would not be harmed provided she did not cause trouble. Duffy beat her husband in the face and head with his gun. Flynn ransacked the apartment searching for money and found $145. Duffy also took money out of her husband's pocket. While she was in the dining room she saw that Duffy had picked up a pillow and placed it on top of his gun. Flynn ordered her to go into the pantry and start pulling out all the drawers. Her husband was sitting on the floor in the dining room at this time. She was in the pantry about 2 or 3 minutes when she heard a crash. As Flynn ran out the front door of the apartment, she picked up her child and headed for her landlady's apartment on the first floor to call the police. She noticed a broken window, approximately a foot away from where her husband had been sitting. Both defendants were in the apartment about 25 or 30 minutes. She denied knowing either defendant by name and denied having ever had them as guests in her home.

*Leonard King testified for the State.*

On November 6, 1971, sometime after 9 P.M., he was accosted by defendants in the vestibule of the building where he resided with his wife Dolly and their 5-year-old daughter Michelle. Defendants, with whom he was acquainted, held guns to his body and forced him to go upstairs to his second-floor apartment where they proceeded to terrorize him and his family for the next 25 to 40 minutes in search of money. Flynn had seen him cash his $250 paycheck that day. His total vacation money was $1200. Flynn at one point struck him in the face and said, "We're going to kill you, because you know us." After ransacking the apartment of $145 and "tape recorders and things like that," Flynn ordered Duffy to "[k]ill him." Duffy picked up a pillow off a nearby bed and moved toward where the witness sat by a window on the dining room floor. When the gun was cocked and raised toward his head, he bolted running full force through the window, breaking it, a storm win-

dow and the screen. He landed on the ground, 22 to 25 feet below, in a dazed condition. Crawling over to the trash cans on the other side of the building, he hid until he saw Duffy run past him with a drawn gun. He then went to a nearby home to summon the police, who on their arrival accompanied him back to his building where he found his wife and child in the landlady's first floor apartment. He was thereafter taken to the hospital where he received treatment for cuts and bruises on his face, hands and legs and a brace for a chipped bone in his wrist.

On cross-examination, King testified that he knew Duffy for about 6 years and Flynn for 10 to 15 years, that he would see and speak to them on the street occasionally, but that he did not socialize with them. He did not offer defendants a drink, but they did make themselves one. He was left alone in the dining room for 5 or 10 minutes while defendants were in the kitchen with his wife. He could not tell what defendants were doing. Defendants kept going back and forth from the front rooms to the back rooms where his wife and child were. Duffy came into the dining room and held a gun on him while Flynn guarded his wife. He at first denied belonging to any organizations, but then admitted belonging to an organization called "The Blacks." He denied having a conversation with Duffy concerning a plan to rob the Drake Hotel or of being given money to purchase uniforms to impersonate employees of the hotel although he admitted that on November 4, 1971, as he was returning from work at the Drake Hotel, Flynn and two companions approached him to suggest such a plan. He refused to be part of the plan and reported this incident the next day to the chief officer at the hotel. On the night of the robbery, after returning from the hospital, he moved his family to his mother's house at 624 West Division. He was unaware that Flynn lived at 524 West Division. He did not see either defendant on the street after the incident nor has he spoken to them since that time. Because he moved out of his apartment he missed the detectives who came calling at his apartment. He was in contact with the police and did sign a complaint 2 weeks later. He denied ever taking any narcotics and exhibited his arms to show that he had no injection scars. The witness identified a .32-caliber gun that Duffy used the night of the robbery.

*Richard Wedgbury testified for the State.*

He is a Chicago police officer and that on November 20, 1971, at approximately 12:30 A.M. he arrested Flynn as he was sitting in a taxicab. He recovered a .32-caliber gun that defendant had taken out of his pants and slipped underneath the front seat.

*Irving Duffy testified on his own behalf.*

He and Flynn had gone to King's home on the night in question to

get some money that they had given him a few days before. It was King's idea to purchase uniforms, pose as employees of the Drake Hotel, and rob the cashier's office of the hotel. King told them that they would have to wait. He did not know King too well and did not trust him. He and King started pushing and shoving each other around while Flynn and Dolly King were in the kitchen making drinks. King was acting kind of crazy, and when he turned around King jumped out the window. He and Flynn went downstairs where they saw King hopping along the alley. They walked over to their automobile and drove away. He further testified that neither he nor Flynn had a gun that night, that he did not take any money from King and that they did not ransack the apartment.

*Alonzo Flynn testified on his own behalf.*

He had known King for 10 to 15 years, that he attended grade school with both King and his wife Dolly, that he used to live across the street from him, that Dolly used to like him, that he had been invited to their home several times, that he and King belong to the Black Family Youth Organization and used to drink and take heroin together. He corroborated Duffy's testimony regarding King's robbery plan and further testified that King took him and Carl Colston to work to show them the layout of the hotel. On the date in question he and Duffy went to King's apartment to get their money back because they decided not to go through with the plan. King started acting funny and refused to give back the money. He was in the kitchen with Dolly when he heard a crash. He did not take any money nor did he threaten King or his family. The next day he saw King on the street. King said that he had been high on drugs that night and was upset because his wife had left him, but that everything was all right now.

*Robert Higgins testified for the defense.*

He corroborated defendants' version that the robbery scheme had been King's idea, that King had been given $100 on November 3, 1971, for the purchase of uniforms and 2 days later told him, Flynn, Duffy and three other fellows who had contributed money that something went wrong and that they should go to his house that night. He, however, did not go to King's house that night. He further testified that he had seen Flynn over at the King's home on several occasions and had heard and seen Flynn and Dolly engaged in conversations at several lounges. He admitted that he was a convicted felon.

*Enis Chaney testified for the defense.*

He, King, Flynn, Duffy and Carl Colston had met on November 3, 1971. King was talking about the Drake Hotel and wanted $100 for some uniforms. He didn't contribute any money.

OPINION

■■ Defendants first contend that the evidence does not establish their guilt beyond a reasonable doubt. They argue that it is unlikely that they would rob persons with whom they were acquainted and who could therefore make a positive identification. Defendants also suggest that the testimony of the complaining witnesses was not credible, was marked with inconsistencies and was contradicted by defendants and two disinterested witnesses.

The rule is well established that it is the function of the trier of fact to weigh testimony, judge the credibility of witnesses, and determine factual matters. Only where the evidence is so unsatisfactory as to leave a reasonable doubt of defendant's guilt will the finding of the trial court be disturbed. *People v. Benedik*, 56 Ill.2d 306, 310, 307 N.E.2d 382.

After reviewing the record, we do not find the evidence improbable or unsatisfactory as to leave a reasonable doubt of defendants' guilt. We cannot accept, as defendants urge, that it was improbable that defendants would rob persons who could later make a positive identification, or that it was unlikely that King would leave his family if they were being threatened and jump out a second-floor window. The purported inconsistencies, on closer examination, reveal no material discrepancies. Regarding the testimony offered by the defense that contradicts the complainants version, we note that it essentially raises a question of credibility of the witnesses. We conclude that defendants' guilt was proven beyond a reasonable doubt.

Defendants also contend that their sentences of 10 to 15 years are excessive. They argue that the trial judge incorrectly found defendants guilty of aggravated battery, considered improper evidence in sentencing defendants and entered sentences grossly in excess of modern penology guidelines.

■■ At the conclusion of defendants' trial, after hearing evidence in aggravation and mitigation, the court stated:

"First, the aggravated battery counts are merged in the armed robbery arising out of the same series of events and under that set of circumstances, I don't think legally I can impose separate sentences. I impose sentence on the armed robbery which is charged and which I found both Mr. Flynn and Mr. Duffy guilty of."

Defendants argue that the court's sentence was affected by it having erroneously found defendants guilty of aggravated battery, an offense, not even charged. We disagree. The finding of guilty was entered the previous day "in manner and form as charged in the indictment." We

are inclined to agree with the State that the trial court's statement was merely a verbal misnomer which did not affect the sentence since the court merged the offenses and entered sentence solely on the armed robbery charge.

■■ The improper evidence that defendants allege affected their sentencing concerned remarks of the prosecutor that Flynn had had a burglary charge stricken and that he had been convicted on a charge of possession of marijuana. The statute for the latter offense had subsequently been declared unconstitutional.

Arrests or other encounters with the law which have not resulted in convictions have been held inadmissible in arriving at the punishment for the crime charged. (*People v. Riley*, 376 Ill 364, 33 N.E.2d 872; *People v. Grigsby*, 75 Ill.App.2d 184, 220 N.E.2d 498.) However, it must be readily apparent that the sentence was affected by such inadmissible evidence (*People v. Johnson*, 13 Ill.App.3d 204, 300 N.E.2d 535.), to the substantial prejudice of defendant. (*People v. Riley*, 376 Ill. 364, 33 N.E.2d 872.) Moreover, it should be presumed that the trial court, on the hearing in mitigation and aggravation, disregarded any incompetent or immaterial evidence. *People v. Bradford*, 23 Ill.2d 30, 177 N.E. 2d 139.

In the instant case, there is no affirmative indication that the sentence imposed was affected by the conviction for possession of marijuana or the stricken burglary charge. Flynn was at the time of the hearing serving probation for his conviction of unlawful use of weapons and Duffy's record showed convictions for robbery, unlawful use of weapons, gambling and failure to register a firearm. When considered with the particular crime evidenced here, we must conclude that substantial admissible evidence supported the sentence.

■■ Defendants' final argument that the sentences were grossly excessive is not borne out by the record. The State's Attorney, because of the invasion of the complainant's home and the threats made on his family, sought 10 to 20 year sentences. The trial judge, however, imposed 10 to 15 year sentences. We do not find an abuse of the trial court's discretion requiring this court to reduce that sentence.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

SULLIVAN, P. J., and DRUCKER, J., concur.